UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CENTRAL FACILITIES OPERATING
COMPANY, L.L.C.

CIVIL ACTION

VERSUS

NO. 11-660-JJB-SCR

CINEMARK USA, INC. ET AL

**RULING**

Central Facilities Operating Company, L.L.C. ("CFOC") seeks a money judgment against Cinemark USA, Inc. ("Cinemark") in the amount of $845,797.23[1] for chilled water services billed and provided to one of Cinemark's movie theatres. Cinemark seeks declaratory relief by way of a counterclaim against CFOC, Perkins Rowe Associates, LLC ("Perkins Rowe"), and Joseph T. Spinosa ("Spinosa"). A bench trial on the merits was held on March 11, 2014 through March 13, 2014. CFOC and Cinemark have filed post-trial briefs (docs. 201 & 202, respectively). Jurisdiction exists pursuant to 28 U.S.C. § 1332. The Court, having considered all testimony, evidence, and arguments presented by the parties, now enters these findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. Findings of Fact[2]

Plaintiff, CFOC, operates a chilled water plant owned by Central Facilities, L.L.C. ("Central Facilities") that serves the Perkins Rowe Development (the "Development") located at the corner of Perkins Road and Bluebonnet Boulevard in Baton Rouge, Louisiana. Cinemark has operated a movie theatre (the "Theatre") at the Development since 2007. During the seven years that Cinemark has been a tenant of the Development, CFOC has provided its Theatre with chilled

---

[1] This is the amount reflected in the most recent invoice submitted to the Court dated March 10, 2014. CFOC Trial Ex. 2.

[2] To the extent that any finding of fact constitutes a conclusion of law, the court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the court hereby adopts it as such.

water services.  The instant action arises from Cinemark's failure to pay $845,797.23 for chilled water services provided to Cinemark during its tenancy.

On March 17, 2005, Cinemark entered into a lease agreement with Perkins Rowe. Article VII of the Theatre Lease provides that,

> [Perkins Rowe] shall cause all necessary utilities to be separately metered to the Theatre at standard public rates…[Cinemark] shall during the Term pay for any and all water sewer, telephone, gas and electric power used in the Theatre.  In the event any of these utility services are provided by [Perkins Rowe], they shall be provided at rates not in excess of those charged by local public utilities.

*Theatre Lease*, Doc. 9-1, Ex. B, art. VII.  Cinemark began operating the Theatre on December 14, 2007.  Since that time, CFOC has supplied Cinemark with chilled water without interruption of service despite Cinemark's failure to make payments on its outstanding bill as reflected in monthly invoices.

CFOC contends that the present suit is one for money owed on an open account and therefore, the lease does not apply.  In the event that the Court finds that the lease does apply, CFOC contends that the terms of the lease are ambiguous as to price and that the Court should supply a reasonable price term.  To that end, CFOC argues that the rate that it charged was reasonable and should be accepted by the Court because it was based upon a rate structure designed in accordance with commonly accepted methodology.

Cinemark contends that it has refused to pay for the chilled water supplied by CFOC because it has no contract with CFOC and therefore, no open account, and because CFOC's charged rates are exorbitant in contravention of the Theatre Lease's terms.  Cinemark also contends that Spinosa, Perkins Rowe's authorized representative with whom Cinemark negotiated the terms of the Theatre Lease, withheld key information including his interest in CFOC and the rate for chilled water to induce Cinemark into entering the Theatre Lease.

Cinemark argues that Spinosa's alleged misdealing and connection to CFOC gives CFOC unclean hands, and therefore, CFOC cannot recover for chilled water billed at a higher price than what was provided for in the Theatre Lease. In the alternative, in an effort to bind CFOC to the terms of the Theatre Lease and preclude CFOC from recovering for chilled water billed at a rate in contravention of its terms, Cinemark contends that CFOC, Perkins Rowe, and all other relevant business entities should be treated as one under a single business entity theory and/or a veil piercing theory. In the further alternative, Cinemark contends that CFOC should be precluded from recovering for chilled water at rates in excess of commercially reasonable rates. Finally, in the further alternative, in the event that the Court finds it liable for the full amount sought by CFOC, Cinemark seeks a declaration that Perkins Rowe and Spinosa are liable for amounts beyond those mandated under the Theatre Lease based upon Perkins Rowe's breach of its terms and Spinosa's fraudulent misrepresentations.

## II.  Conclusions of Law

There are two uncontested facts upon which this suit is predicated: CFOC provided chilled water services to Cinemark's Theatre and Cinemark has failed to pay for such services. Accordingly, in the Court's view, there is an outstanding debt that must be paid. However, before arriving at this resolution—that is, an accounting for this unpaid debt—the Court must resolve the following issues: (1) upon which legal theory is the outstanding debt owed and (2) whether the outstanding debt is reasonable under the circumstances.

Providing a resolution for the first issue that the Court must address is complicated by the fact that CFOC and Cinemark are not in privity of contract. Instead, the Theatre Lease is between Perkins Rowe and Cinemark. CFOC and Cinemark each offer several legal theories to overcome this lack of privity. CFOC seeks to disregard any obligation that it may have under the

Theatre Lease[3] and contends that the outstanding debt is owed on an open account theory under LA. REV. STAT. ANN. § 9:2781 (2010). In the alternative, CFOC offers the equitable contract theories of quantum meruit and unjust enrichment. Cinemark attempts to manufacture privity between itself and CFOC by contending that CFOC is bound by the Theatre Lease based upon the unclean hands doctrine, the single business entity theory, and/or piercing the corporate veil. The Court finds that Cinemark's various theories are unavailing.[4] Accordingly, the Court will only address the theories of recovery proffered by CFOC.

### A. CFOC's Theories: Open Account, Quantum Meruit, and Unjust Enrichment
### 1. Open Account

Louisiana Revised Statutes § 9:2781(D) provides that an open account "includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future

---

[3] Though CFOC contends that the Theatre Lease does not control the outcome of this case (doc. 201, at 2) and distances itself from being bound by the agreement, it nevertheless maintains that Cinemark is obligated under the agreement to pay for the chilled water services that were rendered.

[4] Cinemark has not cited, nor has the Court found, any case law to support binding a non-party to a contract, or creating privity of contract, based upon the theories of single business entity or piercing the corporate veil. Similarly, Cinemark has not cited, nor has the Court found, any case to support using a single business entity or veil piercing theory to preclude a non-party to the contract from recovery. Single business entity and veil-piercing theories are not used to create liability, but rather, they are used to extend liability to other entities once liability has been established. *See Green v. Champion Ins. Co.*, 577 So. 2d 249, 257 (La. App. 1 Cir. 1991) ("Louisiana jurisprudence deals primarily with piercing of the corporate veil to hold a parent corporation solidary liable for the debts of its subsidiary."); *see also id.* at 259 ("When a group of corporations integrate their resources to achieve a common business purpose and do not operate as a separate entity, each affiliated corporation may be held liable for debts incurred in pursuit of its business purpose."). Moreover, Cinemark has not cited, nor has the Court found, any case law in which the theories of single business entity and/or veil piercing are used in tandem with the affirmative defense of unclean hands to preclude a plaintiff from recovery. The cases that Cinemark does rely upon to support its unclean hands defense are distinguishable from the instant case. In *Allvend, Inc. v. Payphone Comm'n Co., Inc.*, 804 So. 2d 27, 34 (La. App. 4th Cir. 2001), the court found that the plaintiff phone company could not recover on its fraud claim against the defendants because it directed its employee to make affirmative misrepresentations to induce the defendants into entering a contract and then sued on the improperly acquired contract. In *Redar, LLC v. Rush*, 51 So. 3d 859, 868 (La. App. 3 Cir. 2010), the court held that the plaintiffs could not recover on behalf of sham entities created for the sole purpose of perpetrating fraud by shielding personal assets from their creditors. Here, as the Court addresses further *infra*, Spinosa did not make any affirmative fraudulent misrepresentations. Even assuming that Spinosa did make affirmative fraudulent misrepresentations, unlike the plaintiff in *Allvend, Inc.*, there is no evidence that CFOC "directed" Spinosa to do so. Finally, unlike the plaintiffs in *Redar, LLC*, there is no evidence that CFOC created sham entities for the sole purpose of perpetrating fraud on Cinemark. Accordingly, the Court finds that the single business entity, veil piercing, and unclean hands doctrines are inapplicable, and thus unavailing.

transactions." Courts have defined an open account as "an account in which a line of credit is running and is open to future modification because of expectations of prospective business dealings, and services are recurrently granted over a period of time." *Signlite, Inc. v. Northshore Serv. Ctr., Inc.*, 959 So. 2d 904, 907 (La. App. 1 Cir. 2007); *see also Shreveport Elec. Co., Inc. v. Oasis Pool Serv. Inc.*, 889 So. 2d 274, 279 (La. App. 2 Cir. 2004). "To prevail on a suit on open account, the creditor must prove that the debtor contracted for the services on an open account." *Dixie Mach. Welding & Metal Works, Inc. v. Gulf States Marine Technical Bureau, Inc.*, 692 So. 2d. 1167, 1169 (La. App. 5 Cir. 1997). "An open account necessarily involves an underlying agreement between the parties on which the debt is based." *Signlite, Inc.*, 959 So. 2d at 907; *see also Gulfstream Servs., Inc. v, Hot Energy Servs. Inc.*, 907 So. 2d 96, 100 (La. App. 1 Cir. 2005); *Dixie Mach.*, 692 So. 2d at 1169. When determining whether an open account exists, courts consider the following factors: (1) whether there were other business transactions between the parties; (2) whether a line of credit was extended by one party to the other; (3) whether there are running or current dealings; and (4) whether there are expectations of other dealings. *Dixie Mach.*, 692 So. 2d at 1170.

Here, it is undisputed that no contract exists between CFOC and Cinemark for chilled water services. Accordingly, Cinemark correctly argues that CFOC's open account claim must fail because the debt is not based on an underlying agreement between the parties. Furthermore, the Court finds that none of the enumerated factors are present in this case. Therefore, as previous courts have found, there was no "meeting of the minds" to establish an open account. *See Dixie Mach.*, 692 So. 2d at 1170; *Gulfstream Servs. Inc.*, 907 So. 2d at 100.

Despite the absence of a contract, CFOC attempts to salvage its open account claim by proffering several unavailing arguments, all of which directly or indirectly rely upon the

existence of a contract. For example, CFOC argues that though the parties did not have a formalized contract, Cinemark's continued acceptance of chilled water created a valid contract because such acceptance constituted an "action or inaction that under the circumstances is clearly indicative of consent." LA. CIV. CODE ANN. art. 1927 (1985). This argument fails to account for the fact that without any negotiations between CFOC and Cinemark, there was no offer, and therefore, no contract. Moreover, Cinemark's immediate challenge of the first invoice belies any assertion that it consented to the price. CFOC also attempts to characterize its agreement with Cinemark as a utility contract and argues that under Louisiana law, when a utility service is provided and a customer consumes the provided service, a contract is created that would support an open account claim. The case upon which CFOC relies does not support this proposition. Instead, in *Grein v. Hawkins*, 295 So. 2d 219, 222 (La. App. 3 Cir. 1974), the court held that a customer with knowledge of who provided the service, the amount of the rates, and the penalties for late payments consented to receiving services from a public utility company and was obligated to pay for the services rendered. This case is distinguishable from the one presently before the Court and therefore, unavailing to CFOC's position.

In sum, in the absence of a contract, there is no open account and CFOC is not entitled to an award on this theory of recovery.

### 2. Quantum Meruit and Unjust Enrichment

In the alternative, CFOC argues that it is entitled to recover in equity under quantum meruit or unjust enrichment.

Louisiana law recognizes two types of quantum meruit: contractual quantum meruit and quasi contractual quantum meruit. *Howell v. Rhoades*, 547 So. 2d 1087, 1089 (La. App. 1 Cir. 1989). Contractual quantum meruit is used "when a contract is implied from the circumstances,

but no agreement as to price has been reached." *Id.* To recover on a contractual quantum meruit theory, an agreement must exist between the parties. *Gulfstream Servs. Inc.*, 907 So. 2d at 100. To recover under a quasi-contractual quantum meruit theory, the plaintiff must confer a benefit on the defendant pursuant to a contract it believed to be valid but was actually void. *Howell*, 547 So. 2d at 1089. Here, CFOC cannot recover on a theory of contractual quantum meruit because no agreement existed between CFOC and Cinemark. Nevertheless, CFOC may be able to recover under the quasi-contractual quantum meruit theory of enrichment without cause.

Enrichment without cause incorporates the principles of unjust enrichment and what is referred to in civil law as *action de in rem verso*. *Gulfstream Servs. Inc.*, 907 So. 2d at 101. In the absence of a contract or agreement, enrichment without cause provides the only legal remedy for a plaintiff's recovery. *Id.* Claims of enrichment without cause arise under Article 2298 of the Louisiana Civil Code which provides that,

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

To succeed on a claim for enrichment without cause, the plaintiff must demonstrate: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and impoverishment; (4) the absence of justification or cause for the enrichment and impoverishment; and (5) the lack of any other remedy at law. *Gulfstream Servs., Inc.*, 907 So. 2d at 101.

Cinemark does not contest CFOC's ability to satisfy the requirements for an unjust enrichment claim. Instead, Cinemark argues that CFOC is precluded from recovering on an unjust enrichment claim because (1) CFOC did not specifically plead unjust enrichment against

Cinemark and (2) an unjust enrichment claim cannot be maintained when CFOC has pled an open account claim.

Before addressing the merits of an unjust enrichment claim, a court must make the threshold inquiry as to whether the plaintiff has pled or raised without objection such a claim. *Gulfstream Servs. Inc.*, 907 So. 2d at 101. "Louisiana remains a fact pleading state and '[n]o technical forms of pleading are required.'" *Id.* (quoting LA. CODE CIV. PROC. art 854). "Except in the case of a default judgment, every final judgment must grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." *Id.* (quoting *T.L. James & Co., Inc. v. Kenner Landing Inc.*, 562 So. 2d 914, 917 (La. 1990)).

In *Gulfstream Servs. Inc.*, the court found that though the plaintiff did not explicitly plead an unjust enrichment claim, a review of the record revealed an ample basis for such a claim. 907 So.2d at 101. Relying on the pleadings and the evidence presented at trial, the court reasoned that the record contained facts establishing a conferred benefit for which the plaintiff was not compensated. *Id.* Here, CFOC did not specifically plead an unjust enrichment claim against Cinemark. Nevertheless, the Court finds that the pleadings and the evidence support a claim for unjust enrichment. CFOC pled facts and presented evidence that the provision of chilled water was beneficial to Cinemark and Cinemark gained this benefit without compensating CFOC.

Cinemark next argues that CFOC cannot recover on a claim for unjust enrichment in the same suit that it maintains a claim on an open account. The Court disagrees.[5] Indeed, several

---

[5] In support of its argument, Cinemark points to language found in Magistrate Judge Riedlinger's Report and Recommendation denying CFOC's Motion to Remand. (Doc. 52). There, relying upon *Walters v. MedSouth Record Mgmt., LLC*, 38 So. 3d 243 (La. 2010), the Magistrate Judge stated that "[a]ctually pleading another cause of action, delictual or contractual, precludes a plaintiff from seeking to recover based on unjust enrichment." (Doc. 52, at 6). The Court finds reliance on this language unpersuasive. First, the Magistrate's Report and Recommendation addressed a specifically alleged unjust enrichment claim against a defendant no longer a party to this suit. Second, the Magistrate Judge found that CFOC had pled an unjust enrichment claim against Cinemark but did not address

8

courts have allowed a plaintiff to recover under similar circumstances. *See Smith v. Albrecht*, 965 So.2d 879, 882-83 (La. App. 1 Cir. 2007) (finding that the plaintiff could recover in quantum meruit despite suing on an open account); *Gulfstream Servs. Inc.*, 907 So.2d at 102 (allowing the plaintiff to recover on an unjust enrichment claim after finding that the plaintiff could not successfully recover on an open account). Accordingly, the Court finds that CFOC has asserted a cognizable claim for unjust enrichment.

Turning its attention to the merits, the Court finds that the record supports CFOC's recovery on its unjust enrichment claim. Cinemark was enriched by CFOC providing chilled water to cool its Theatre. CFOC was impoverished, or suffered an economic detriment, by Cinemark's refusal to pay for the chilled water services provided. Because the economic loss suffered by CFOC is the direct result of Cinemark's refusal to pay for the beneficial chilled water services, the impoverishment and enrichment are connected. The record does not contain any juridical act that would justify Cinemark's refusal to pay for the chilled water services. Finally, in the absence of a contract or an agreement, CFOC has no other legal remedy available to seek recovery. Therefore, after a thorough review of the record, the Court finds that CFOC is entitled to recover under the theory of unjust enrichment. As such, the Court does not need to address CFOC's other theories of recovery.

### 3. Measure of Compensation

---

whether it was precluded by its open account claim. Doc. 52, at p. 13, fn 22. Third, this Court has previously narrowly interpreted the Louisiana Supreme Court's decision in *Walters* to only preclude unjust enrichment claims from being pled alongside tort claims. *See Property One, Inc. v. USAgencies, L.L.C.*, 830 F.Supp. 2d 170, 175 (M.D. La. 2011). The Court maintains its reading of *Walters* and finds that it does not preclude recovery under the circumstances of this case. Finally, Cinemark asserts in its post-trial brief that CFOC has unsuccessfully pursued an unjust enrichment claim. This is incorrect. While CFOC references a claim for unjust enrichment in a reply brief in support of its motion for summary judgment (doc. 123, at 6), this claim was not addressed in the Court's ruling on summary judgment, and therefore, the merits of this claim have remained an open question to be resolved by the Court's present ruling.

Article 2298 of the Louisiana Civil Code contains the appropriate measure of compensation for a case of unjust enrichment. It provides that "[t]he amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less." LA. CIV. CODE ANN. art. 2298 (1996). It further provides that, "[t]he extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time the judgment is rendered." *Id.*

CFOC argues that its rates are reasonable and asserts that Cinemark failed to offer any evidence or qualified testimony to call into question the rate design used to calculate the rates. Cinemark claims that CFOC's rates are exorbitant and based upon inherently unreliable data and calculations.

To support its position, CFOC offered the testimony of Steven Ward ("Ward") and Wilfred Barry ("Barry").[6] Ward is the Chief Operating Officer of TME, a consulting engineering firm which specializes in energy conservation and energy services work such as rate analysis, rate designs, and optimizing energy efficiency. CFOC hired TME to design the rate structure and set the rate for the Development's chilled water plant. When CFOC hired TME, Ward worked as an energy analyst. As such, he performed the cost-of-service survey, designed the rate structure, and set the rate for chilled water for CFOC.

During his testimony, Ward thoroughly explained his rate design methodology. He detailed the steps taken and explained the inputs and considerations evaluated at the various steps of his analysis. He explained that the rates were developed using the same methodology and sorts of inputs that would be used by a public utility company. Specifically, Ward testified that

---

[6] In its post-trial brief, CFOC requests reconsideration of the Court's Order (doc. 189), in which the Court ruled that it would not accept Ward and Barry as experts but rather, would admit their respective testimony and afford it the appropriate weight. After review of CFOC's request, the Court, in its full discretion, maintains its ruling and will not admit Ward or Barry as experts.

TME was retained to develop "utility like rates for CFOC" and to accomplish that end, "[TME] felt that an objective and a consistent industry accepted approach to ratemaking would be warranted, [] in order to further justify the rates to [CFOC's] tenants down the road should there ever be a question."[7] (Tr. 129:23-130:10, Mar. 11, 2014). Ward testified that his intent was to develop a rate that was fair and equitable to all of the concerned parties. Finally, Ward stated that he conducted an informal review of CFOC's rates in 2011, after the chilled water plant had expanded to accommodate for the Development's substantial customer growth, and he again concluded that the rates charged by CFOC were reasonable.

Barry is an engineer with, and the current president of, SJB Group, a consulting engineering firm that offers planning, surveying, and engineering services for infrastructure and utilities. During his time with SJB, Barry has worked with municipalities and public utility companies to help develop rates and redesign rate structures for natural gas. As part of his job, he prepared cost-of-study studies for public utility companies.

CFOC hired Barry to conduct an audit of their chilled water system. As a part of the audit, Barry was asked to evaluate the rate CFOC was charging its tenants for chilled water. Though Barry reviewed the cost-of-services study conducted by Ward, he conducted his own cost-of-services study from which he developed a revenue and rate schedule based upon an independent review of CFOC's financials and cost information, and a tour of the chilled water plant. After conducting his independent review, Barry recommended that CFOC institute a simpler rate, which allocated a share of fixed costs to each customer in a different manner than was being done under the current system. Barry explained that this recommendation did not imply that the rates that CFOC was charging were unreasonable. To the contrary, Barry

---

[7] Similarly, Glen Jarrell, CFOC's Chief Operating Officer, testified that TME was instructed to design a rate as if they were designing a rate for a public utility company so that the rates would be fair and able to withstand future scrutiny. *See* Tr. 14:10-20, Mar. 11, 2014.

concluded that the rates that CFOC charged were reasonable and opined that CFOC's realized rate of return would be acceptable to the Louisiana Public Service Commission ("LPSC").

Cinemark offered two witnesses to critique the findings of CFOC's witnesses: Arthur "Art" Justice ("Justice"), Cinemark's Vice President of Energy and Sustainability, and Sam Patton ("Patton"), a mechanical and electrical engineer. Neither witness criticized Ward's rate structure. In fact, rate design was not discussed during Justice's testimony. When it was discussed during Patton's testimony, he admitted that he had no criticism of the rate structure. Instead, his only criticism was of the fixed cost of the chiller because while the development only used 50% of the chiller's capacity, the tenants were charged as if the development used 100%. Simply put, Patton believed that the chilled water plant was too big. However, Patton's criticism failed to account for the practice of building redundancy[8] into the system to ensure that cooling could be provided if one of the chillers was out of service.

After reviewing the testimony and evidence presented at trial, the Court finds that the rate charged by CFOC was reasonable. The rate design used to produce the rate was developed in accordance with commonly accepted practices by an engineering firm with experience in developing rates that met the criteria of public utility companies. Ward designed a rate that, consistent with common practice, allowed for a recovery of cost and a reasonable rate of return. Subsequently, this rate was independently reviewed by Barry who ultimately concluded that the rate that CFOC was charging was reasonable and opined that the rate of return realized by CFOC would be acceptable to LPSC. Finally, in 2011, Ward conducted an informal review of CFOC's

---

[8] Ward defined redundancy as "the additional capacity that in the event that you have a single piece of equipment fail…you have other equipment in the design or in the plant that can continue to provide service[.]" Tr. 188:13-17, Mar. 11, 2014. Ward explained that redundancy was built in to the plant to comply with the terms of CFOC's contract with the Hospital, which required that redundancy be built in, and to accommodate any future expansion at the Development. *See* Tr. 189:2-12, Mar. 12, 2014.

rates and again concluded that the rates were reasonable. Cinemark failed to show that CFOC's rates were unreasonable or excessive. Moreover, while Cinemark demonstrated that the invoices failed to explain some of the charges, it failed to show that the invoices were inherently unreliable and based upon a faulty rate design or erroneous data. Cinemark's own expert took no issue with the rate design developed and used by Ward and TME.

For the reasons stated herein, the Court finds that CFOC is entitled to recover the amount that it has been impoverished due to its uncompensated provision of chilled water to Cinemark over the last seven years less any prejudgment interest.[9]

## B. Cinemark's Counterclaims: Unclean Hands, Single Business Entity, Piercing the Corporate Veil, Breach of Contract, and Fraudulent Misrepresentations

Cinemark has asserted counterclaims against CFOC, Perkins Rowe, and Spinosa seeking damages, declaratory relief, and attorneys' fees. In its primary counterclaim, Cinemark attempts to impose contractual liability upon CFOC under the Theatre Lease on a single business entity theory and/or a piercing the corporate veil theory. In the alternative, Cinemark argues that (1) Perkins Rowe is liable under the Theatre Lease for breach of contract and (2) Spinosa is liable under the Theatre Lease for his misrepresentations by omission as to which entity would provide the chilled water. The Court has found *supra* that single business entity and veil piercing is not a vehicle by which contractual liability may be imposed upon CFOC. Accordingly, the Court will address Cinemark's breach of contract claim asserted against Perkins Rowe and fraudulent misrepresentations claim asserted against Spinosa.

### 1. Breach of Contract Claim Against Perkins Rowe

---

[9] In Louisiana, "[t]he rule is that, as the amount of the award is not liquidated until the judgment is rendered when recovery is limited to quasi contract, interest is only calculated from date of judgment." *Howell*, 547 So. 2d at 1090; *see also Gulfstream Servs. Inc.*, 907 So. 2d at 103. ("For unliquidated or quasi-contractual damages, such as enrichment without cause, interest runs only from the date of judgment."). Accordingly, CFOC cannot recover any prejudgment interest.

To succeed on a breach of contract claim, the plaintiff must prove (1) the obligor undertook an obligation to perform; (2) the obligor failed to perform the obligation (the breach); and (3) the obligor's failure to perform resulted in damages to the obligee. *Favrot v. Favrot*, 68 So. 3d 1099, 1108-09 (La. App. 4 Cir. 2011).

The interpretation of a contract is the determination of the common intent of the parties with courts giving the contractual words their generally prevailing meaning unless the words have acquired a technical meaning. LA. CIV. CODE ANN. arts. 2045, 2047 (1985); *see also Louisiana Ins. Guar. Ass'n. v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 763 (La. 2002). When the words of a contract are clear and explicit and lead to no absurd consequences, the court may make no further interpretation in search of the parties' intent. LA. CIV. CODE ANN. art. 2046 (1985). Though it is generally inadmissible to vary the terms of a written contract, parol or extrinsic evidence may be admitted if the written expression of the common intention of the parties is ambiguous. *Ortego v. State, Through the Dep't of Trans. & Develop.*, 689 So. 2d 1358, 1363 (La. 1997). Whether a contract is ambiguous or not is a question of law. *Fourroux v. Bd. of Comm'rs for the Orleans Levee Dist.*, 837 So. 2d 698, 701 (La. App. 4 Cir. 2003). A contract is considered ambiguous if its provisions do not include the issue, its terms are subject to more than one interpretation, its provisions are uncertain or ambiguous, or its language does not reveal the intent of the parties. LA. CIV. CODE ANN. art. 2046 (1985); *see also Brown v. Drillers, Inc.*, 630 So. 2d 741, 748 (La. 1994). If a contract has ambiguous terms, those terms must be construed against the contract's drafter. LA. CIV. CODE ANN. art. 2056 (1985).

The governing provision of the Theatre Lease between Perkins Rowe and Cinemark provides in relevant part that,

[Perkins Rowe] shall cause all necessary utilities to be separately metered in the Theatre at standard public rates and in the sizes and pressures as needed for the operation of [Cinemark's] business. [Cinemark] shall during the Term pay for any and all water, sewer, telephone, gas, and electric power used in the Theatre. In the event any of these utility services are provided by [Perkins Rowe], they shall be provided at rates not in excess of those charged by local public utilities.

*Theatre Lease*, Doc. 9-1, Ex. B, art. VII.

Read in its entirety, the clear language of Article VII establishes the parties' intent to establish obligations under two different scenarios. In the first scenario, Perkins Rowe "shall cause" all necessary utilities to be provided to the Theatre, meaning that Perkins Rowe would enlist a third party utility company to provide all necessary utilities. In the second scenario, the utilities "are provided by" Perkins Rowe, meaning that Perkins Rowe would provide some or all of the necessary utilities itself. "Perkins Rowe shall cause" or shall bring about,[10] denotes indirect provision of services, while "are provided by Perkins Rowe" denotes the direct provision of services. The Court's reading is further supported by the second scenario's use of the qualifying phrase, "In the event." This phrase demonstrates that the parties contemplated entities other than Perkins Rowe providing utility services, and it suggests that the parties did not intend for Perkins Rowe to be the sole supplier of such services.

Given that CFOC, not Perkins Rowe, provided the chilled water service to Cinemark's Theatre, the present dispute falls under the first scenario provided for in Article VII. Under the first scenario, Perkins Rowe is obligated to ensure that "all necessary utilities" are provided to Cinemark's Theatre at "standard public rates" and Cinemark is obligated to pay for such services. *Theatre Lease*, Doc. 9-1, Ex. B, art. VII. It is undisputed that though not listed in Article VII, chilled water is a necessary utility. The crux of this dispute is how to apply the term "standard public rates" to chilled water. Because the state of Louisiana has not set a "standard

---

[10] BLACK'S LAW DICTIONARY 251 (9th ed. 2009).

public rate" for this utility, the Court finds that the term is ambiguous when applied to chilled water. In light of this ambiguity, the Court will evaluate the evidence presented at trial to determine the parties' intent and supply the proper price term in light of that intent.

At trial, Cinemark presented the testimony of Thomas Owens ("Owens"), Cinemark's representative during the Theatre Lease negotiations, Justice, Cinemark's Vice President of Energy and Sustainability, and Spinosa, Perkins Rowe's representative, to demonstrate the parties' intent.

Owens is Cinemark's Executive Vice President of Real Estate and was one of Cinemark's corporate representatives during the Theatre Lease negotiations with Perkins Rowe.[11]  According to Owen's testimony, Cinemark was approached by several brokers with the opportunity to relocate to the Development.  (Tr. 201:18-21, Mar. 12, 2014).  Cinemark evaluated the opportunity but hesitated to pursue it further because it was currently operating a ten-screen movie theatre near the Development at its Siegen Lane location.  (Tr. 201:24-202:11, Mar. 12, 2014).  However, after the brokers and Spinosa made several attractive overtures, including Cinemark having to pay little to no costs for the new theatre or equipment and Spinosa assuming the tenant's obligations under the Siegen Lane lease, Cinemark began lease negotiations to relocate to the Development.  (Tr. 202:2-204:9, Mar. 12, 2014).

During the lease negotiations, Spinosa asked if he could provide chilled water to the Theatre.  (Tr. 204:13-20, Mar. 12, 2014).  Though Cinemark normally used rooftop units on its theatres, it agreed to allow Spinosa to provide chilled water as long as the cooling costs did not exceed the cooling costs of its Siegen Lane location.  (Tr. 204:13-23, Mar. 12, 2014).  Owens testified that Cinemark considered utility costs as a part of its due diligence process.  (Tr. 209:13-19, Mar. 12, 2014).  Nevertheless, the parties did not spend excessive time discussing the cost of

---

[11] The other corporate representative was Paul Ledbetter who did not testify at trial.

using chilled water at the Theatre because Spinosa assured Cinemark that the cooling costs would not be more than Cinemark's costs at its Siegen Lane location. (Tr. 205:15-19, Mar. 12, 2014). Justice testified that had Cinemark known that the chilled water rate was more than twice the amount that it spent on cooling its Siegen Lane location, it would not have agreed to use chilled water. (Tr. 52:5-8, Mar. 12, 2014).

Spinosa executed the Theatre Lease with Cinemark on behalf of Perkins Rowe (Tr. 175:1-3, Mar. 12, 2014), and personally participated in the lease negotiations (Tr. 196:11-13, Mar. 12, 2014). Spinosa testified that he and Cinemark did not discuss rates during the lease negotiations. (Tr. 179:12-180:3; 180:24-25, Mar. 12, 2014). Instead, he testified that the tenant's questions concerning the rate of chilled water were, in some cases, referred to Ward. (Tr. 178:7-10, Mar. 12, 2014).

After reviewing the evidence and testimony presented at trial, the Court is persuaded by the testimony of Owens and finds that the parties' intent was that the cooling costs at the Theatre would not exceed the cooling costs that Cinemark paid at its Siegen Lane location. As part of its due diligence, Owens testified that Cinemark gave cooling costs the same weight that it gave every input in its location analysis. Though the Court believes that Cinemark's due diligence on the issue of cooling costs left something to be desired, the Court is convinced that Cinemark's more relaxed approach was justified by Spinosa's assurances that the cooling costs at the Theatre would not exceed those paid at Cinemark's Siegen Lane location.[12]

Owen's testimony is further supported by the fact that the Development was designed to have a movie theatre as its anchor tenant and its success was partially dependent on securing such a tenant. As Owens explained,

---

[12] Such a relaxed approach is further justified by Cinemark's prior experience with similar utility provision deals offered by landlords as an incentive to entice Cinemark to locate to the landlord's development. *See* Tr. 40:16-41:2, Mar. 13, 2014.

So it was pretty important to [Spinosa's] project to have a theater[.] [I]t brings nighttime traffic, and it's a great way for a developer to have the ability to bring restaurants and night clubs. It generally, you know, adds longer hours to the life of a shopping center well into the evening.

(Tr. 209:6-11, Mar. 12, 2014). Given the movie theatre's importance to the Development's success, the Court believes that Spinosa made assurances of low cooling costs as an incentive for Cinemark to relocate. Indeed, he gave similar cost incentives to entice Cinemark into lease negotiations. Without evidence to the contrary the Court is bound to presume that Spinosa acted in good faith, and therefore, the Court finds that Spinosa intended to make good on his assurances and intended that Perkins Rowe would cause chilled water to be provided to the Theatre at a price not to exceed what Cinemark currently paid at its Siegen Lane location.

Perkins Rowe has not provided evidence to rebut Cinemark's evidence of the parties' intent.[13] Instead, Spinosa testified that he did not engage in any discussions concerning the rate of chilled water. The Court finds this assertion to be incredulous. Undoubtedly, negotiations between two sophisticated business parties involved, at least to some degree, a discussion of utility costs. Surely, in convincing Cinemark to break its usual custom of installing air conditioning units to use chilled water provided by the Development's chilled water plant, one of the parties brought up the issue of price.

Therefore, in light of the unrebutted testimony presented by Cinemark on the issue of intent, the Court finds that the parties intended that the term "standard public rates" meant a rate not to exceed the rates that Cinemark was currently paying to cool the theatre at its Siegen Lane

---

[13] Indeed, Perkins Rowe and Spinosa have not been active participants in the present litigation. As a result, Cinemark has requested that sanctions be imposed upon Perkins Rowe and Spinosa for failing to comply with the Court's Pretrial Order. Specifically, Cinemark claims that Perkins Rowe and Spinosa's failure to file a witness list, final exhibit list, and proposed findings of fact and conclusions of law warrant sanctions. Courts have wide discretion in determining whether to impose sanctions for the violation of their pretrial orders. *See Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996). Here, the Court declines to impose sanctions against Perkins Rowe and Spinosa finding that their failure to participate in the litigation is of no consequence at this stage of the proceedings.

location. The record reveals that Cinemark used rooftop air conditioning units to cool the theatre at its Siegen Lane location. (Tr. 212:16-18, Mar. 12, 2014). Such cooling cost consisted of the electricity rate charged by the local public utility company. (Tr. 47:22-25; 212:16-22, Mar. 12, 2014). While Cinemark only intended to pay for electricity for its cooling costs, it acknowledged that the provision of chilled water requires both the use of electricity and water, and it has demonstrated a willingness to pay the public utility rate for both. (Tr. 54:21-55:16, Mar. 13, 2014). Accordingly, using the average rate of electricity and water charges over the term of the lease, Cinemark has proposed that the amount due under the terms of the Theatre Lease is $234,795.63. According to the Court's math,[14] Cinemark has proposed 8.3 cents per ton hour as an acceptable rate and consistent with the parties' intent. Therefore, the Court accepts Cinemark's proffered rate of 8.3 cents per ton hour as the intended rate for chilled water.

Finally, neither party disputes that chilled water was provided to Cinemark's Theatre in excess of 8.3 cent per ton hour. Indeed, the average rate for chilled water that was metered to the Theatre was between 23 to 29 cents per ton hour. (Cinemark Trial Ex. 73-B) Accordingly, the Court finds that Perkins Rowe breached Article VII of the Theatre Lease by causing chilled water to be provided to the Theatre well in excess of the intended price.[15]

In sum, the Court concludes that Perkins Rowe undertook an obligation to have chilled water provided to Cinemark at a rate not to exceed what Cinemark was currently paying at its

---

[14] The Court divided the proposed amount of $234,795.63 by the total ton hours of 2,814,283 that were used. *See* Tr. 54:19-55:16, Mar. 13, 2014.

[15] The Court observes that Cinemark breached its obligation under the Theatre Lease by refusing to pay for chilled water services. Nevertheless, the Court finds that Cinemark's breach does not prevent it from pursuing its claim or from recovering damages. "When there are reciprocal obligations, the obligor of one may not be put in default unless the obligor of the other has performed or is ready to perform his own obligation. Also, a party to a communicative contract may refuse to perform his obligation if the other has failed to perform." *Retail Merchants Ass'n, Inc. v. Forrester*, 114 So. 3d 1175, 1179 (La. App. 2. Cir. 2013) (citing LA. CIV. CODE ANN. arts. 1993, 2022). Here, Perkins Rowe was the first to breach the Theatre Lease by failing to cause chill water to be provided at the rate contemplated by the parties. Therefore, Cinemark's subsequent breach was excused.

Siegen Lane location. Perkins Rowe breached this obligation by causing CFOC to provide Cinemark's Theatre with chilled water at rates well in excess of what Cinemark paid at its Siegen Lane location. Therefore, the only remaining element that the Court will address is the appropriate measure of damages. However, before determining the proper measure of damages, the Court will address Cinemark's fraudulent misrepresentation claim asserted against Spinosa.

### 2. Misrepresentations Against Spinosa

Louisiana Civil Code article 1953 defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unfair advantage for one party or to cause a loss or inconvenience to the other." Article 1953 further provides that "[f]raud may also result from silence or inaction." LA. CIV. CODE ANN. art. 1953. To succeed on a claim for fraudulent misrepresentations, the plaintiff must prove the following three elements by a preponderance of the evidence: "(1) a misrepresentation, suppression or omission of true information; (2) the intent to obtain an unjust advantage or to cause to damage or inconvenience to the other party; and (3) the resulting error must relate to a circumstance substantially influencing the other party's contractual consent." *Terrebonne Concrete, LLC v. CEC Enterprises, LLC*, 76 So. 3d 502, 509-10 (La. App. 1 Cir. 2011). "To find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information." *Greene v. Gulf Coast Bank*, 593 So. 2d 630, 632 (La. 1992). Whether a legal duty exists is a question of law. *Terrebonne Concrete, LLC*, 76 So. 3d at 510.

Cinemark alleges that Spinosa fraudulently misrepresented that Perkins Rowe would be providing chilled water to its Theatre. To support this claim, Cinemark contends that Spinosa made this misrepresentation so that he would receive a windfall from the exorbitant rate charged by his company CFOC; and had Cinemark been aware of that CFOC was providing the chilled

water, it would not have agreed to the terms of the Theatre Lease. Cinemark further alleges that Spinosa committed fraud by silence by failing to disclose both that CFOC would be providing chilled water to Cinemark's Theatre and the rate structure for chilled water.

After review, the Court finds that Cinemark has failed to prove fraud by an affirmative misrepresentation. First, it is well established that an action of fraud cannot be asserted based upon a promise to perform an act in the future or the mere failure to perform a promise. *Automatic Coin Enterprises Inc. v. Vend-Tronics, Inc.*, 433 So. 2d 766, 768 (La. App. 5 Cir. 1983) ("The jurisprudence is clear that fraud cannot be imputed from alleged misrepresentation(s) alone…Neither can fraud be predicated upon the mere failure to perform a promise, nor is nonperformance of an agreement to do something at a future time alone evidence of fraud."). Instead, fraud "must be based solely on a person's intent *not* to perform." *Id.* (emphasis in original). Here, while the evidence reveals that Spinosa represented to Cinemark that Perkins Rowe would be providing chilled water to the Theatre, the evidence did not reveal that Spinosa did not intend for Perkins Rowe to provide the chilled water when he made this promise. Therefore, the circumstances of this case are more akin to a failure to perform a promise, which is a breach of the contract, than an intentional misrepresentation.

Second, Cinemark has failed to show that Perkins Rowe providing the chilled water substantially influenced it to consent to the terms of the Theatre Lease. To the contrary, Owens testimony revealed that it was Spinosa's assurances regarding the *price* of chilled water and not the *provider* that induced Cinemark to agree to the terms of the contract. Therefore, in light of this testimony, the Court finds that Cinemark has failed to satisfy the third prong of the fraud analysis.

Regarding Cinemark's allegation of fraud based upon Spinosa's silence, the Court finds that Cinemark failed to prove that Spinosa owed it a legal duty to disclose. Louisiana jurisprudence fails to provide much guidance on defining when a party has a legal duty to speak. *See Greene v. Gulf Coast Bank*, 580 So. 2d 712, 716 (La. App. 3 Cir. 1991) *writ granted*, 585 So. 2d 554 (La. 1991) *and rev'd*, 593 So. 2d 630, 633 (La. 1992). Nevertheless, courts have consistently found that a legal duty must be predicated on a special relationship like a fiduciary relationship. *See Greene v. Gulf Coast Bank*, 593 So. 2d 630, 633 (La. 1992) (finding no duty to disclose when there was not a fiduciary relationship between the defendant and the plaintiff); *Terrebonne Concrete, LLC*, 76 So. 3d at 513 (concluding that there was no fiduciary relationship between the defendant and the plaintiff, and therefore, the defendant did not breach its duty to disclose). "The defining characteristic of a fiduciary relationship is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor." *Terrebonne Concrete, LLC,* 76 So. 3d at 509. Here, Cinemark neither argued nor presented evidence at trial to demonstrate that such a relationship existed between the parties. Accordingly, the Court must find that Cinemark has failed to show by a preponderance of the evidence that Spinosa committed fraud by silence or omission.

Accordingly, and for the reasons stated, Cinemark has failed to prove by a preponderance of the evidence that Spinosa committed fraud either by affirmative misrepresentations or by silence.

### 3. Damages for Perkins Rowe's Breach

Under Louisiana law, an obligor is liable for the damages caused by his failure to perform a conventional obligation. LA. CIV. CODE art. 1994 (1985). Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. LA. CIV. CODE art. 1995

(1985). "These codal articles have been used to award damages to a lessee for breach of an obligation under a lease." *Graci v. Gasper John Palazzo, Jr., L.L.C.*, 119 So. 3d 741, 749 (La. App. 5 Cir. 2013).

As the Court has previously found, Perkins Rowe obligated itself under the contract to "cause" chilled water to be provided to the Theatre at a price not to exceed what Cinemark was paying at its Siegen Lane location. The Court has further found that Perkins Rowe breached its obligation under the Theatre Lease when it caused CFOC to provide chilled water to the Theatre at a rate in excess of the amount contemplated by the lease. As a result of Perkins Rowe's breach, Cinemark has been exposed to liability for the nonpayment of chilled water services provided by CFOC. Therefore, the Court finds that Perkins Rowe, as obligor, is liable to Cinemark, as obligee, for the damage caused by the breach of its obligation under the Theatre Lease to provide chilled water at the intended price. Accordingly, Perkins Rowe is liable for the amount charged by CFOC in excess of the intended rate of 8.3 cents per ton hour.

### 4. Cinemark's Request for Attorneys' Fees

In addition to the declaratory relief sought in its counterclaim, Cinemark seeks attorneys' fees and costs incurred as a result of prosecuting and defending this matter. Cinemark seeks these expenses against Perkins Rowe pursuant to the Theatre Lease. Louisiana law does not allow the recovery of attorneys' fees except when authorized by contract or statute. *State v. Williamson*, 597 So. 2d 439, 441 (La. 1992). Under Louisiana law, the lease constitutes the law between the parties and is interpreted and enforced in accordance with general principles of Louisiana contract law. *Good v. Saia*, 9 So. 3d 1070, 1074 (La. App. 4 Cir. 2009).

Article XXXIII of the Theatre Lease governs the issue of attorneys' fees. It provides in relevant part,

In the event any action is instituted by a party to enforce any of the terms and provisions contained herein, the prevailing party in such action shall be entitled to its reasonable attorneys' fees, costs, and expenses.

Pursuant to the clear language of the Theatre Lease, Cinemark, as the prevailing party on its breach of contract claim against Perkins Rowe, is entitled to attorneys' fees, costs, and expenses for pursuing this claim. Accordingly, Cinemark is entitled to an award for the attorneys' fees, costs, and expenses incurred as a result of pursuing its breach of contract claim against Perkins Rowe.

## III.  Conclusion

Based upon the foregoing, CFOC is entitled to recover the full amount owed for its provision of chilled water services to Cinemark's Theatre plus interest as provided for by law. Pursuant to the terms of the Theatre Lease, Cinemark's liability for this amount is limited to 8.3 cents per ton hour for chilled water services consumed, and Perkins Rowe is liable for the remaining balance. Finally, pursuant to the terms of the Theatre Lease, Cinemark is entitled to attorneys' fees, costs, and expenses incurred during the pursuit of its breach of contract claim against Perkins Rowe.

CFOC shall file a proposed judgment in conformity herewith after attaining approval as to form from Cinemark and Perkins Rowe within 14 days of the date of this ruling.

Cinemark shall file the proper motion and accompanying documentation demonstrating the precise amount of attorneys' fees requested within 45 days of the date of this ruling. Perkins Rowe shall file any opposition within 21 days of the date of Cinemark's motion.

Signed in Baton Rouge, Louisiana, on August 6, 2014.

_____

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**